UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAYRA I. WATLER BENNETT,
                          Plaintiff,

-v-

NANCY A. BERRYHILL, *Acting Commissioner of Social Security*,
                          Defendant.

17-CV-6077 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      After suffering a stroke, Plaintiff Mayra I. Watler Bennett applied to the Commissioner of Social Security (the "Commissioner") for disability insurance benefits and supplemental security income pursuant to the Social Security Act, 42 U.S.C. § 301 *et seq.* The Commissioner denied Bennett's application, and Bennett now seeks judicial review of the denial. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner has filed the Certified Administrative Record upon which the denial was based (Dkt. Nos. 10 to 10-9), and both parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) (Dkt. Nos. 11, 15). For the reasons that follow, Bennett's motion is granted, and the Commissioner's cross-motion is denied.

**I.    Background**

      The following background is drawn from the Certified Administrative Record appearing at Docket Numbers 10 through 10-9.

    **A.    Medical History**

    Plaintiff Mayra I. Watler Bennett was born in Honduras in 1960, but she has been living in the Bronx at all relevant times. (Certified Admin. Record ("R.") 546; Dkt. No. 1 ¶ 2.) Since at least 2011, Bennett has experienced diabetes, high blood pressure, and obesity. (R. 525.)

1

On November 7, 2013, Bennett woke to discover that her left hand was not functioning properly and that the left side of her face "looked funny." (R. 416.) She went to the emergency room, where she presented with slurred speech, left-side facial droop, and weakness in her left arm and hand. (R. 416–17.) A brain scan revealed an arterial blockage and related tissue damage, and Bennett was referred to the stroke team. (R. 422.) Believing that Bennett's uncontrolled diabetes, high blood pressure, and high cholesterol had caused the issue, the stroke team advised her about the importance of taking her medications and moderating her alcohol intake. (R. 422, 479.) Meanwhile, over the course of her hospital stay, Bennett participated in physical therapy, where she exhibited a "[s]lightly unsteady" gait, "poor endurance," and a need to rest frequently when walking. (R. 467.) By the time of her discharge, though, her condition had stabilized and her "[l]eft-sided weakness and speech [had] improved." (R. 422–23.)

Bennett returned to the hospital on December 9, 2013, for a follow-up visit with Dr. Ullanda Fyffe. (R. 545.) Dr. Fyffe observed "some residual [left] handed weakness" but made no note of any other limitations. (R. 545.) She told Bennett to keep monitoring her blood-sugar levels and taking her diabetes and blood-pressure medication. (R. 548–50.) When Bennett saw Dr. Fyffe again on March 7, 2014, she mentioned headaches and continued left-hand weakness but reported that she was otherwise "doing better." (R. 537.) Dr. Fyffe noted that Bennett's diabetes management was "not at goal" and urged exercise and a healthy diet.[1] (R. 541–42.)

---

[1] Bennett also met with an ophthalmologist, Dr. Susan Fromer, on April 2, 2014. (R. 673.) Dr. Fromer remarked a buildup of fluid in Bennett's eyes that was "threatening [her] vision." (*Id.*) Consequently, Bennett visited Dr. Meir Baalhaness on May 27, 2014, for laser treatment on her right eye. (R. 675.)

2

Thereafter, on July 17, 2014, Bennett had an initial follow-up appointment with a stroke specialist, Dr. Deepa Bhupali.[2] (R. 668.) At that time, Bennett reported that she had been taking her medications, had stopped drinking alcohol, and had found her left-side extremities "improved in strength." (*Id.*) Finding that Bennett's stroke had "nearly resolved," Dr. Bhupali scheduled no further follow-up but advised Bennett to continue focusing on diet and exercise. (R. 669.)

On August 8, 2014, though, Bennett returned to Dr. Fyffe, reporting shortness of breath, swelling in the legs, and back pain. (R. 659.) Dr. Fyffe noted that Bennett had not been keeping to a diabetes-friendly diet and that she had been unable to afford her blood-pressure medication. (R. 659.) And on November 19, 2014, Bennett again reported to Dr. Fyffe that she had run out of her medications and that she was having trouble maintaining a medically appropriate diet. (R. 649.) Dr. Fyffe once more reiterated the importance of diet and exercise. (R. 656.)

After that, Bennett did not again seek medical attention until January 12, 2016—over a year later—at which point she visited Nurse Practitioner Miriam Piñon. (R. 643.) Bennett told Nurse Piñon that she had been "off all medication for six months" and that she was experiencing severe headaches. (*Id.*) In additional visits to Nurse Piñon over the following months, Bennett continued to complain of headaches, as well as knee and back pain.[3] (R. 606, 620, 639.)

Finally, in June 2016 Bennett began to experience vomiting and dizziness (R. 614), which at one point prompted her to visit the emergency room (R. 676). During a June 6, 2016 consultation, Dr. Stephanie Hocking examined Bennett and concluded that the vomiting was likely an adverse reaction to the combination of medicines Bennett was taking. (R. 616.) After

---

[2] Bennett had missed a previously scheduled follow-up appointment. (R. 423, 537.)

[3] During this period, Bennett also visited ophthalmologist Dr. David Maria Rubaltelli, who during an April 22, 2016 examination observed immature cataracts and advised Bennett to "[m]onitor [them] carefully for progression." (R. 624, 627.)

Dr. Hocking advised Bennett to stop taking one of her medications (*id.*), Bennett returned to Nurse Piñon on June 18, 2016, and reported that the vomiting and nausea had resolved (R. 610).

B.     **Benefits Application and Associated Medical Evaluations**

On November 25, 2013, a few weeks following her stroke, Bennett applied to the Commissioner for disability insurance benefits and supplemental security income. (R. 91–92.)

At the Commissioner's request, Bennett submitted to an examination by Dr. Dipti Joshi on April 7, 2014. (R. 554.) Dr. Joshi noted Bennett's obesity, high cholesterol, high blood pressure, diabetes, slurring, and hand and foot numbness. (R. 556.) As for Bennett's physical capabilities, Dr. Joshi believed that Bennett had a "mild limitation [on] gripping in the left side" and should avoid "strenuous activity." (R. 557.) But despite Bennett's limitations, Dr. Joshi found that Bennett had full strength in her arms and full hand and finger dexterity. (R. 556.) Based in part on Dr. Joshi's notes, an agency decision-maker found, among other things, that Bennett could lift up to twenty pounds occasionally and up to ten pounds frequently, and that Bennett could stand and/or walk for about six hours out of an eight-hour workday.[4] (R. 87–88.)

The Commissioner denied Bennett's benefits application on April 14, 2014. (R. 93.) On the Commissioner's view of the evidence, Bennett "had elevated blood pressure . . . and some weakness in [the] left hand." (R. 97.) But the evidence did not show to the Commissioner's satisfaction that Bennett's condition was "severe enough to keep [her] from working." (*Id.*)

---

[4] Bennett's daughter also submitted a written "function report" on behalf of Bennett. (R. 343–53.) This report indicated that Bennett had difficulty dressing and bathing unassisted (R. 346), that Bennett would become weak and disoriented at times (R. 348), that Bennett's eyesight sometimes became blurry, and that Bennett's left hand "d[id] not move properly" (R. 351).

4

Disagreeing with the Commissioner's conclusion, Bennett requested a hearing before an Administrative Law Judge ("ALJ"). (R. 101–02.) As Bennett awaited the hearing, she received three additional medical evaluations aimed at determining her eligibility for benefits.

First, Dr. John Fkiaras examined Bennett at the Commissioner's request on January 30, 2016. (R. 558.) Bennett told Dr. Fkiaras that she was experiencing blurry vision, headaches, numbness in her hands, left-side weakness, and pain in her left hand, right knee, and lower back, as well as difficulty with walking, standing, lifting, and climbing stairs. (*Id.*) After examining Bennett, Dr. Fkiaras noted that Bennett had full arm, leg, and grip strength, full hand and finger dexterity, and a full range of motion in her shoulders, elbows, forearms, and wrists. (R. 560–61.) Based on his observations, Dr. Fkiaras believed Bennett to be capable of occasionally lifting up to ten pounds and of walking for a total of one hour in an eight-hour workday. (R. 563–64.)

Second, on April 26, 2016, Dr. Allen Meisel conducted an examination of Bennett at the Commissioner's request. (R. 572.) Bennett reported to Dr. Meisel that her left arm was weak and that she had "difficulty holding things" and would "drop[] anything that [was] heavy." (*Id.*) Dr. Meisel's examination showed that Bennett had full arm and grip strength, full hand and finger dexterity, and a full range of motion in the shoulders, elbows, forearms, and wrists. (R. 574.) In Dr. Meisel's view, Bennett could lift up to ten pounds frequently, albeit with her right hand only, and could walk for up to four hours out of an eight-hour workday. (R. 576–77.)

Third and finally, Nurse Piñon, along with Dr. Sheila Alas-Hun, completed a "medical source statement" on May 4, 2016. (R. 597–604.) According to the statement, Bennett's pain was "[o]ften" severe enough "to interfere with attention and concentration." (R. 599.) Although Nurse Piñon and Dr. Alas-Hun noted that Bennett had full use of both hands, they advised that she lift no more than ten pounds, and that she only occasionally lift even that much. (R. 602.)

5

### C. ALJ Proceedings and Associated Testimony

Bennett first appeared before an ALJ on February 10, 2016, with her daughter acting as her representative. (R. 43.) After experiencing a bit of difficulty in eliciting answers from Bennett, the ALJ asked, "Do you speak English well?" (R. 46.) Bennett replied, "Kind of," and the ALJ decided to postpone the hearing so that a Spanish-language interpreter could attend. (R. 46–47.)

Bennett next appeared before an ALJ on April 12, 2016, again with her daughter present, and this time with an interpreter present as well. (R. 69.) Again, though, proceedings hit a snag. After noticing that Bennett had no "lawyer or other qualified individual to represent [her]," the ALJ informed her that she had "a right to [be] represented by an attorney or a non-attorney." (R. 70.) Bennett replied, "I would like to have a representative," and, after some initial hesitation, accepted the ALJ's offer of a thirty-day delay so that she could find an attorney. (R. 71–72.)

Before concluding the hearing, however, the ALJ took testimony from a medical expert, Dr. Howard Shapiro. (R. 72–75.) Based on his review of Bennett's records, Dr. Shapiro opined that Bennett "appear[ed] to have recovered" from her stroke and that her "only limitation[]" was diabetes. (R. 73.) In Dr. Shapiro's view, Bennett could lift twenty pounds frequently with either hand and could stand for four hours or walk for three hours out of an eight-hour workday. (R. 73–74.) The ALJ pointed out that Dr. Shapiro's assessment appeared to restrict Bennett to sedentary work—the least active form of work in the Commissioner's taxonomy, *see* 20 C.F.R. § 404.1567(a)—because light work—the next most active category, *see id.* § 404.1567(b)— requires an ability to stand or walk for up to six hours out of an eight-hour shift. (R. 74.) Dr. Shapiro responded that he had based his opinion on Dr. Fkiaras's January 30, 2016 assessment,

6

which stated that Bennett had "marked limitations in her ability to walk or stand."[5]  (R. 74–75.)

Dr. Shapiro made clear, however, that he believed those supposed limitations to be "totally contradicted by the history and physical examination" Dr. Fkiaras had done.  (*Id.*)

On July 7, 2016, Bennett—this time represented by counsel—made her third appearance before an ALJ.  (R. 50.)  At that hearing, Bennett testified about her work and medical history.  In particular, she testified that she used to perform paid work as a babysitter at her daughter's house, with her daughter present "[a]t times" to provide assistance.  (R. 57; *see also* R. 53.)  As for her physical limitations, she testified that she experienced left-hand weakness and pain in her right knee and lower back.  (R. 54.)  She believed herself to be capable of lifting five to ten pounds, provided that she did so with her right hand only.  (R. 57.)  At times, she found herself unable to recall things clearly (R. 56), and she also said that her medications made her weak and drowsy (R. 57).

The ALJ next heard testimony from a vocational expert.  (R. 58–66.)  According to the expert, an individual of Bennett's age, education, and work experience could perform Bennett's previous child-care work as Bennett had performed it, provided that the individual could perform light work and, specifically, could lift up to twenty pounds occasionally and could stand and/or walk for up to six hours out of an eight-hour workday.  (R. 59.)  The expert also noted that a person with Bennett's work history would possess skills that are transferrable to at least three other light-work jobs and at least three specified sedentary-work jobs.  (R. 61–62.)

---

[5] At the time of Dr. Shapiro's testimony, Dr. Fkiaras's assessment had not yet been supplemented by Dr. Meisel's report or the joint report from Nurse Piñon and Dr. Alas-Hun.

7

### D. The Commissioner's Decision

On August 4, 2016, the ALJ issued a decision denying Bennett's benefits application. (R. 17.) The ALJ found that Bennett suffered from severe impairments in the form of diabetes, hypertension, obesity, and a history of stroke. (R. 25.) But the ALJ observed that Bennett had "show[n] improvement when she was compliant with her diabetic and hypertension medications," had "recovered well" from her stroke, and had shown "predominantly good results" overall in her medical examinations. (R. 32.) The ALJ therefore found Bennett capable of light work that could require her to lift up to twenty pounds occasionally and up to ten pounds frequently and could require her to stand and/or walk for up to six hours out of an eight-hour workday. (R. 26.) Although the ALJ acknowledged that Drs. Meisel, Fkiaras, and Alas-Hun had each concluded based on their examinations of Bennett that Bennett could lift no more than ten pounds, the ALJ rejected these opinions as inconsistent with the medical evidence. (R. 30–32.)

Having thus assessed Bennett's physical capabilities, the ALJ concluded that Bennett was capable of performing her prior child-care work at a light exertion level. (R. 33.) Further, given Bennett's skills, including the ability to communicate in English, the ALJ identified three other light-work jobs that Bennett was capable of performing, as well as three jobs that Bennett could have performed even had her physical capabilities limited her to sedentary work. (R. 34–35.)

Bennett sought review of the ALJ's decision from the Social Security Appeals Council. (R. 13.) The Appeals Council denied Bennett's request for review on June 13, 2017, and with that denial the ALJ's decision became the Commissioner's final decision. (R. 1.)

### E. The Instant Suit

On August 11, 2017, Bennett filed the instant suit in federal district court, seeking judicial review of the Commissioner's benefits denial pursuant to 42 U.S.C. §§ 405(g) (disability insurance benefits) and 1383(c)(3) (supplemental security income benefits). (Dkt. No. 1.) The

Certified Administrative Record was filed on January 16, 2018 (Dkt. Nos. 10 to 10-9), and Bennett moved for judgment on the pleadings on March 19, 2018 (Dkt. No. 11). The Commissioner cross-moved for judgment on the pleadings on May 17, 2018 (Dkt. No. 15), and Bennett's motion and the Commissioner's cross-motion are now fit for resolution.

## II. Legal Standard

This Court must affirm the Commissioner's conclusions as long as they "are supported by substantial evidence in the record as a whole [and] are [not] based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). In this context, "[s]ubstantial evidence is 'more than a mere scintilla.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Instead, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson*, 402 U.S. at 401). That said, the substantial-evidence standard "is still a very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). Specifically, "once an ALJ finds facts," this Court "can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Id.* (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

## III. Discussion

To be eligible for disability insurance benefits or supplemental security income benefits, a claimant must be "under a disability." 42 U.S.C. § 423(a)(1)(E); *see also id.* § 1382(a)(1). A claimant satisfies this qualification only if she suffers from an impairment "of such severity" that it prevents her not only from doing her "previous work" but also from "engag[ing] in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A); *see also id.* § 1382c(a)(3)(A). Under the process the Commissioner has established for assessing disability, a claimant bears the burden of demonstrating that a severe impairment prevents her

9

from performing her past work. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If a claimant successfully does so, the claimant is considered disabled unless the Commissioner can show that the claimant is capable of performing other work that exists in the national economy. *See Bowen*, 482 U.S. at 146 n.5.

Here, the Commissioner concluded that Bennett suffers from several severe impairments. (R. 25–26.) But the Commissioner found that these impairments left Bennett with sufficient "residual functional capacity to perform light work" meeting certain specifications (R. 26–33), and that this level of physical ability allowed Bennett to perform not only her past child-care work but also certain other jobs in the national economy (R. 33–35). The Commissioner therefore concluded that Bennett was not disabled and so was ineligible for benefits. (R. 35–36.)

Bennett raises several challenges to the Commissioner's determinations, but this Court need consider only one of them—namely, her claim that certain of the Commissioner's residual functional capacity findings were unsupported by substantial evidence. (Dkt. No. 12 at 13–16.)

A claimant's "residual functional capacity" is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The Commissioner determines a claimant's residual functional capacity on the basis of "all of the relevant medical and other evidence" in the record, including "statements about what [the claimant] can still do that have been provided by medical sources," as well as "descriptions and observations . . . provided by" the claimant and others. *Id.* §§ 404.1545(a)(3), 416.945(a)(3). In evaluating this evidence, the Commissioner generally gives greater weight to the opinions of those who have observed the claimant directly than to the opinions of those who have not.[6] *See id.*

---

[6] Due to the fact that Bennett filed her benefits application in 2013, the Court relies on the standards that govern claims filed prior to March 27, 2017.

10

§§ 404.1527(c)(1), 416.927(c)(1) (as between acceptable medical sources, the Commissioner generally "give[s] more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not"); *id.* §§ 404.1527(f)(1), 416.927(f)(1) (as between acceptable medical sources and other sources, the Commissioner may give preference to the opinion of a source other than an acceptable medical source if, among other things, "he or she has seen the [claimant] more often than the [acceptable medical] source").

Here, Bennett contends, the Commissioner's residual functional capacity finding was flawed because it contradicted the opinions of her examining physicians. Most notably, although all three examining physicians who expressed a view as to the amount Bennett could lift—Drs. Fkiaras, Meisel, and Alas-Hun—set her limit at ten pounds (R. 563, 576, 602), the Commissioner found Bennett capable of lifting up to twenty (R. 26). And while both examining physicians who offered a view on the maximum time Bennett could walk during an eight-hour workday—Drs. Fkiaras and Meisel—set her limit at or under four hours (R. 564, 577), the Commissioner found that Bennett could stand and/or walk for up to six hours out of an eight-hour workday (R. 26).

The Court agrees that the Commissioner lacked substantial evidence for departing from the consensus view of the medical professionals who examined Bennett and so had the most direct insight into her physical limitations.

As for lifting, the record contains two explicit statements that Bennett is capable of lifting more than ten pounds. These statements, though, cannot reasonably be understood to overcome the cumulative force of three independently derived, mutually consistent medical judgments from examining physicians. First, an agency decision-maker opined based on Bennett's November 2013 hospital records and Dr. Dipti Joshi's April 7, 2014 examination notes that

11

Bennett could lift up to twenty pounds. (R. 87.) But nothing suggests that this decision-maker had medical qualifications or had ever seen Bennett. *See Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (holding that the findings of a doctor who "merely reviewed [a claimant's] medical file" but "never examined" the claimant could not "constitute substantial evidence to overcome a consensus among [the claimant's] examining doctors").[7] Moreover, the Commissioner believed that Dr. Joshi's evaluation, which informed the decision-maker's opinion, was owed "little weight" precisely because it was "vague" as to the scope of Bennett's physical limitations. (R. 31–32.)

Second, medical expert Dr. Howard Shapiro, who testified at Bennett's April 12, 2016 hearing, also stated that Bennett could lift up to twenty pounds. (R. 73.) He too, however, had no firsthand observational basis for this view, and the Commissioner recognized as much by affording his testimony "little weight."[8] (R. 32.) Furthermore, neither the agency decision-maker mentioned above nor Dr. Shapiro had the benefit of the full administrative record when opining, sight unseen, on Bennett's capabilities: the agency decision-maker's opinion preceded *all* of the three examining-physician reports that capped Bennett's lifting capabilities at ten pounds, and Dr. Shapiro's testimony preceded two of the three.

---

[7] Although *Simmons* deals with the Railroad Retirement Act, 45 U.S.C. § 231 *et seq.*, rather than the Social Security Act, both statutes employ the same substantial-evidence standard, *see Poole v. R.R. Ret. Bd.*, 905 F.2d 654, 661 (2d Cir. 1990).

[8] In addition, Bennett points out that Dr. Shapiro was never cross-examined because the ALJ chose to move forward with his testimony in the absence of counsel, even after Bennett had expressed a desire for representation. (Dkt. No. 12 at 10–13.) In light of the Court's conclusion that remand to the agency is warranted for other reasons, the Court need not decide whether, as Bennett contends, the ALJ committed legal error by proceeding in the absence of counsel (*id.*) or whether, as the Commissioner contends, Bennett's attorney's subsequent access to Dr. Shapiro's testimony was sufficient to safeguard Bennett's rights (Dkt. No. 16 at 25). That said, the Court notes that this potential procedural irregularity provides yet another reason why Dr. Shapiro's testimony could not reasonably be preferred over the opinions of three examining physicians.

As for walking, the agency decision-maker's report is the *only* record evidence that explicitly suggests that Bennett is capable of walking for more than four hours in an eight-hour workday. The agency decision-maker opined, consistent with the Commissioner's finding, that Bennett could "[s]tand and/or walk" for up to six hours in an eight-hour shift. (R. 87–88.) But for the reasons given above, this opinion cannot constitute substantial evidence in the face of two examining physicians' contrary reports. To the extent the Commissioner found Bennett capable of walking for up to six hours in an eight-hour period, then, that finding lacks an adequate basis.[9]

Perhaps recognizing the above concerns, the Commissioner does not now argue that the opinions of the agency decision-maker and Dr. Shapiro constitute substantial evidence sufficient to justify the challenged findings. Instead, pointing out that "there is no requirement that the [residual functional capacity] finding be supported by a medical opinion" in the first place (Dkt. No. 16 at 19), the Commissioner contends that the residual functional capacity findings are adequately supported by Bennett's underlying medical records (Dkt. No. 16 at 16–18). For example, the Commissioner notes that Bennett received generally positive medical assessments following her stroke, that several examinations revealed only slightly diminished left-arm strength, and that Bennett was frequently assessed as having a full range of arm motion. (*Id.*)

The Court is unconvinced. Certainly, an examining physician's "formal opinion[]" on a claimant's residual functional capacity is not required when the medical record is otherwise

---

[9] Of course, the Commissioner may well have accepted that Bennett should not walk more than four hours in an eight-hour shift. After all, in finding Bennett capable of "stand[ing] *and/or* walk[ing]" for six hours in an eight-hour shift (R. 26 (emphasis added)), the Commissioner could have believed Bennett capable of performing some combination of walking and standing during those six hours despite an inability to devote those hours entirely to walking. But to the extent that the Commissioner did find Bennett's ability to walk to be constrained beyond the six-hour limitation on Bennett's combined standing and walking, the Commissioner never suggested any such constraint to the vocational expert whose testimony formed the basis for the Commissioner's conclusion that Bennett was capable of performing her past work.

13

"adequate to permit an informed finding" as to that capacity, *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order); *accord Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order). But even if Bennett's medical records might have been sufficient to justify the challenged residual functional capacity findings *in the absence* of any formal opinions from Bennett's examining physicians, the Court here must ask whether those records form a reasonable basis for *rejecting* the formal opinions of *all* of Bennett's examining physicians. *See Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (summary order) ("[A]n analysis of the substantiality of the evidence must also include that which detracts from its weight." (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988))).

The Court concludes that they are not. While Bennett's medical records certainly could be read to suggest that Bennett is capable of lifting twenty pounds and walking for six hours out of an eight-hour workday, they are also fully consistent with the greater limitations suggested by Bennett's examining physicians. For example, the record is replete with references to Bennett's knee and back pain (R. 558, 620, 639), weakness (R. 347, 537, 558), and inability to perform basic physical tasks without difficulty (R. 346, 558). Moreover, the record makes clear that Bennett's capabilities are informed not only by the aftereffects of her stroke but also by her obesity, high blood pressure, and intermittently uncontrolled diabetes, as well as by the side effects of her medications.[10] Because Bennett's medical records were therefore fully in line with

---

[10] In making this observation, the Court takes no view on Bennett's argument that the Commissioner gave inadequate consideration to her obesity (Dkt. No. 12 at 16–18), the side effects of her medication (Dkt. No. 12 at 18–19), or her characterizations of her own medical condition (Dkt. No. 12 at 19–20). Rather, the Court simply cites these factors as illustrative of the manifold considerations that could lead an examining physician to suggest more restrictive limitations on a patient's physical activities than the limitations that the patient's medical records, standing in a vacuum, might otherwise seem to recommend.

14

the uniform views of the medical professionals who examined her, the records hardly constitute a substantial basis for rejecting those views. *See Poole v. R.R. Ret. Bd.*, 905 F.2d 654, 662 (2d Cir. 1990) (rejecting an agency finding under the Railroad Retirement Act's comparable substantial-evidence standard where the finding contradicted the consensus view of "the various specialists who ha[d] seen" the claimant during the relevant period). To the contrary, the fact that Bennett's records nowhere explicitly indicate the scope of her physical limitations should, if anything, counsel in favor of relying on the medical opinions of the doctors who are able to offer the sort of holistic, individualized assessment that the Commissioner's own regulations recognize is best derived from firsthand observation. *See* 20 C.F.R. §§ 404.1527(c)(1), (f)(1); *id.* §§ 416.927(c)(1), (f)(1).

In sum, the Commissioner's residual functional capacity findings regarding Bennett's lifting and walking abilities are not supported by substantial evidence. And because those findings informed the Commissioner's conclusion that Bennett is capable of performing her past work—and so is not disabled—the Court must set aside the benefits denial and remand this case to the agency. In doing so, the Court acknowledges the possibility that any error may have been harmless. After all, the Commissioner has identified three sedentary-work positions that Bennett is supposedly capable of performing (R. 35) and that would likely not require much walking or lifting, *see* 20 C.F.R. § 404.1567(a) (explaining that sedentary work "involves lifting no more than 10 pounds at a time" and requires walking only "occasionally"). But the Commissioner has made no argument as to harmlessness, and this Court therefore takes no view. In light of this

uncertainty, however, the Court declines Bennett's invitation to reverse the Commissioner's benefits denial wholesale instead of remanding for further proceedings.[11] (Dkt. No. 12 at 25.)

With today's holding, the Court does not depart from the rule that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002), and that the Commissioner is free to arrive at any conclusion that is supported by substantial evidence when the record is viewed in its totality. But where, as here, the Commissioner rejects the consensus views of multiple examining physicians, unelaborated treatment notes that are fully coherent with those views are not a sufficient basis for doing so.[12]

## IV. Conclusion

For the foregoing reasons, Bennett's motion for judgment on the pleadings is GRANTED and the Commissioner's cross-motion is DENIED. The Clerk of Court is directed to close the motions at Docket Numbers 11 and 15 and to close this case. This matter is hereby remanded to the Social Security Administration for further proceedings.

SO ORDERED.

Dated: February 4, 2019
New York, New York

J. PAUL OETKEN
United States District Judge

---

[11] The Court likewise declines to direct the Commissioner to assign the matter to a different ALJ on remand, as Bennett requests. (Dkt. No. 12 at 25.)

[12] Because the Commissioner's insufficiently supported assessment of Bennett's residual functional capacity requires remand in any event, the Court need not address the remainder of Bennett's arguments. Specifically, the Court need not determine whether the Commissioner was obliged to give "controlling weight," 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), to the opinion of Dr. Alas-Hun, Bennett's treating physician (Dkt. No. 12 at 13–16); whether the questions the ALJ posed to medical expert Dr. Shapiro were improper (Dkt. No. 12 at 20–22); or whether the Commissioner lacked an adequate basis for concluding that Bennett has the English-language skills necessary to perform certain specifically identified jobs (Dkt. No. 12 at 22–25). Bennett remains free to press these points on remand, to the extent that they remain relevant.